## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

**BERNARD ANDERSON**
2672 S. Ethel Street
Detroit, Michigan 48217

*And*

**ANDREW BIELSTEN AND
ASHTON TRAWINSKI, h/w**
7045 Whitby Avenue
Clemmons, North Carolina 27012

*And*

**JOSHUA BRENT AND
JUSTINE BRENT, h/w**
12160 N. Lazy River Drive
Marana, Arizona 85653

*And*

**MARK CUNARD**
862 S. Main Street, Unit A
Williamstown, New Jersey 08094

*And*

**DANIEL DAVIS AND
LESLEY GEORGE-DAVIS, h/w**
4086 Maplelynn Street SW.
Canton, Ohio 44706

*And*

**RANDALL FARRIOR JR.
AND ALICE FARRIOR, h/w**
5969 Feather Wind Way
Fort Worth, Texas 76135

*And*

**JURY TRIAL DEMANDED**

**ALBERTO FLORES AND**
**MARIA FLORES, h/w**
1225 Sunny Acres Avenue
N. Las Vegas, Nevada 89081

*And*

**DENNIS HALL**
7757 Burnt Oak Trail
Jacksonville, Florida 32256

*And*

**ANTHONY JOHNSON AND**
**NANCY JOHNSON, h/w**
3819 Stonewall Street
Greenville, Texas 75401

*And*

**KYLE KNICKERBOCKER**
14 School Street, Unit 5
West Warwick, Rhode Island 02893

*And*

**YANG LEE**
7830 N. 78th Street
Milwaukee, Wisconsin 53223

*And*

**KELLY MCDANIEL AND**
**KATHY ALEMAN, h/w**
9634 S. 157th Place
Gilbert, Arizona 85234

*And*

**THOMAS MCMILLAN AND**
**SUSAN MCMILLAN, h/w**
479 Old Cabaniss Road
Forsyth, Georgia 31029

*And*

**JOEL NAVARRO AND**
**MARY NAVARRO, h/w**
1068 S. 7th Avenue, Apt. 49
Avenal, California 93204

*And*

**VINCENT PANICO AND**
**LANA PANICO, h/w**
459 Raven Ridge Drive
Kernersville, North Carolina 27284

*And*

**ANDREW PARISIO AND**
**BILLEE JO PARISIO, h/w**
36 Iroquois Drive
Parlin, New Jersey 08859

*And*

**ELONA PRESSON AND**
**JAMES MANZO, h/w**
1320 Bridgton Place Court
Winston-Salem, North Carolina 27127

*And*

**GREGORY ROCHELLE AND**
**CAROL ROCHELLE, h/w**
987 Speights Road
Keatchie, Louisiana 71046

*And*

**BRYAN SCOTT-WILLIAMS AND**
**KERRIE DONHAM, h/w**
93 Union Mill Road
Breckenridge, Colorado 80424

*And*

**ROBERT SHEFFIELD AND**
**MICHELLE SHEFFIELD, h/w**
289 Vista Drive
Washington, Louisiana 70589

*And*

**GARY SOVEREIGN AND
DANIELLE SOVEREIGN, h/w**
3265 S. 84th Street, Apt. 3
Milwaukee, Wisconsin 53227

*And*

**GUSTAVO TUDON JR. AND
REGINA ACUÑA, h/w**
1930 Eldorado Street
Memphis, Tennessee 38128

*Plaintiffs,*

v.

**SIG SAUER, INC.**
72 Pease Boulevard
Newington, New Hampshire 03801

*Defendant.*

## PLAINTIFFS' COMPLAINT – CIVIL ACTION

1.     Upon the information discovered through research, testing, subpoenas and document production, the Sig Sauer P320 is the most dangerous pistol sold in the United States market.

2.     Plaintiffs are individuals, including federal law enforcement agents, police officers, combat veterans, firearms instructors, and civilians, who dedicated significant portions of their lives to the safe use of weapons, but who were shot and injured because of the defective nature of the P320.

3.      Sig Sauer knew, as early as 2016 and possibly earlier, that unintended discharges caused by unintended trigger actuation was a known risk of the P320's design, as testified to by one of the P320's chief designers, Matt Taylor.

4.      Sig Sauer also knew that unintended trigger actuation by a foreign object contacting the P320 trigger could result in an unintended discharge causing death.

5.      Sig Sauer affirmatively told the U.S. Army that its design of the Sig Sauer P320 **_with_** the inclusion of a manual thumb safety would mitigate the risk of unintended discharges caused by trigger actuation.

6.      The vast majority of Sig Sauer P320 models sold to law enforcement and law abiding citizens does not come with a manual thumb safety even as an option.

7.      No Sig Sauer P320s, as of the manufacture date of any P320 involved in this action, was equipped with a tabbed trigger safety.

8.      No Sig Sauer P320s, as of the manufacture date of any P320 involved in this action, as of the subject P320's manufacture date was equipped with a grip safety.

9.      The vast majority of Sig Sauer P320 models sold to law enforcement and law abiding citizens do not come with any external safety even as an option, meaning a safety on the exterior of the gun that prevents or limits unintended discharges.

## PARTIES

10.     Plaintiff, Bernard Anderson ("Plaintiff" or "Anderson"), is an adult individual, citizen, and resident of the State of Michigan residing at the above-captioned address.

11.     Plaintiff, Andrew Bielsten ("Plaintiff" or "Bielsten"), is an adult individual, citizen, and resident of the State of North Carolina, residing at the above-captioned address.

12.     Plaintiff, Ashton Trawinski ("Plaintiff" or "Mrs. Trawinski"), is the wife of Andrew Bielsten, an adult individual, citizen, and resident of the State of North Carolina, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

13.     Plaintiff, Joshua Brent ("Plaintiff" or "Brent"), is an adult individual, citizen, and resident of the State of Arizona, residing at the above-captioned address.

14.     Plaintiff, Justine Brent ("Plaintiff" or "Mrs. Brent"), is the wife of Joshua Brent, an adult individual, citizen, and resident of the State of Arizona, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

15.     Plaintiff, Mark Cunard ("Plaintiff" or "Cunard"), is an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address.

16.     Plaintiff, Daniel Davis ("Plaintiff" or "Davis"), is an adult individual, citizen, and resident of the State of Ohio residing at the above-captioned address.

17.     Plaintiff, Lesley George-Davis ("Plaintiff" or "Mrs. George-Davis"), is the wife of Daniel Davis, an adult individual, citizen, and resident of the State of Ohio, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

18.     Plaintiff, Randall Farrior Jr. ("Plaintiff" or "Farrior"), is an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address.

19.     Plaintiff, Alice Farrior ("Plaintiff" or "Mrs. Farrior"), is the wife of Randall Farrior Jr., an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

20.     Plaintiff, Alberto Flores ("Plaintiff" or "Flores"), is an adult individual, citizen, and resident of the State of Nevada, residing at the above-captioned address.

21.     Plaintiff, Maria Flores ("Plaintiff" or "Mrs. Flores"), is the wife of Alberto Flores, an adult individual, citizen, and resident of the State of Nevada, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

22.     Plaintiff, Dennis Hall ("Plaintiff" or "Hall"), is an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address.

23.     Plaintiff, Anthony Johnson ("Plaintiff" or "Johnson"), is an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address.

24.     Plaintiff, Nancy Johnson ("Plaintiff" or "Mrs. Johnson"), is the wife of Anthony Johnson, an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

25.     Plaintiff, Kyle Knickerbocker ("Plaintiff" or "Knickerbocker"), is an adult individual, citizen, and resident of the State of Rhode Island residing at the above-captioned address.

26.     Plaintiff, Yang Lee ("Plaintiff" or "Lee"), is an adult individual, citizen, and resident of the State of Wisconsin residing at the above-captioned address.

27.     Plaintiff, Kelly McDaniel ("Plaintiff" or "McDaniel"), is an adult individual, citizen, and resident of the State of Arizona residing at the above-captioned address.

28.     Plaintiff, Kathy Aleman ("Plaintiff" or "Mrs. Aleman"), is the wife of Kelly McDaniel, an adult individual, citizen, and resident of the State of Arizona, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

29.     Plaintiff, Thomas McMillan ("Plaintiff" or "McMillan"), is an adult individual, citizen, and resident of the State of Georgia, residing at the above-captioned address.

30.     Plaintiff, Susan McMillan ("Plaintiff" or "Mrs. McMillan"), is the wife of Thomas McMillan, an adult individual, citizen, and resident of the State of Georgia, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

31.     Plaintiff, Joel Navarro ("Plaintiff" or "Navarro"), is an adult individual, citizen, and resident of the State of California, residing at the above-captioned address.

32.     Plaintiff, Mary Navarro ("Plaintiff" or "Mrs. Navarro"), is the wife of Joel Navarro, an adult individual, citizen, and resident of the State of California, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

33.     Plaintiff, Vincent Panico ("Plaintiff" or "Panico"), is an adult individual, citizen, and resident of the State of North Carolina residing at the above-captioned address.

34.     Plaintiff, Lana Panico ("Plaintiff" or "Mrs. Panico"), is the wife of Vincent Panico, an adult individual, citizen, and resident of the State of North Carolina, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

35.     Plaintiff, Andrew Parisio ("Plaintiff" or "Parisio"), is an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address.

36.     Plaintiff, Billee Jo Parisio ("Plaintiff" or "Mrs. Parisio"), is the wife of Andrew Parisio, an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

37.     Plaintiff, Elona Presson ("Plaintiff" or "Presson"), is an adult individual, citizen, and resident of the State of North Carolina, residing at the above-captioned address.

38.     Plaintiff, James Manzo, ("Plaintiff" or "Mr. Manzo"), is the husband of Elona Presson, an adult individual, citizen, and resident of the State of North Carolina, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

39.     Plaintiff, Gregory Rochelle ("Plaintiff" or "Rochelle"), is an adult individual, citizen, and resident of the State of Louisiana, residing at the above-captioned address.

40.     Plaintiff, Carol Rochelle ("Plaintiff" or "Mrs. Rochelle"), is the wife of Gregory Rochelle, an adult individual, citizen, and resident of the State of Louisiana, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

41.     Plaintiff, Bryan Scott-Williams ("Plaintiff" or "Scott-Williams"), is an adult individual, citizen, and resident of the State of Colorado, residing at the above-captioned address.

42.     Plaintiff, Kerrie Donham ("Plaintiff" or "Mrs. Donham"), is the wife of Bryan Scott-Williams, an adult individual, citizen, and resident of the State of Colorado, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

43.     Plaintiff, Robert Sheffield ("Plaintiff" or "Sheffield"), is an adult individual, citizen, and resident of the State of Louisiana, residing at the above-captioned address.

44.     Plaintiff, Michelle Sheffield ("Plaintiff" or "Mrs. Sheffield"), is the wife of Robert Sheffield, an adult individual, citizen, and resident of the State of Louisiana, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

45.     Plaintiff, Gary Sovereign ("Plaintiff" or "Sovereign"), is an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address at all relevant times.

46.     Plaintiff, Danielle Sovereign ("Plaintiff" or "Mrs. Sovereign"), is the wife of Gary Sovereign, an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

47.     Plaintiff, Gustavo Tudon Jr. ("Plaintiff" or "Tudon"), is an adult individual, citizen, and resident of the State of Tennessee, residing at the above-captioned address.

48.    Plaintiff, Regina Acuña ("Plaintiff" or "Mrs. Acuña"), is the wife of Gustavo Tudon Jr., an adult individual, citizen, and resident of the State of Tennessee, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

49.    Defendant, Sig Sauer, Inc. ("Sig Sauer" or "Sig Sauer") is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, organized and incorporated under the laws of Delaware.

## JURISDICTION AND VENUE

50.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is perfect diversity of citizenship between the parties.  The defendant is a resident of the state of New Hampshire.  Each plaintiff resides in a state other than New Hampshire.  The amount in controversy exceeds $75,000.00.  The court may exercise personal jurisdiction over the defendant because it is a resident of New Hampshire.

51.    Venue is proper because a substantial part of the acts and omissions giving rise to this action occurred in New Hampshire.

## GENERAL ALLEGATIONS

52.    Sig Sauer designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

53.    Sig Sauer was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. in October 2007. Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

54.    The Sig Sauer P320 is susceptible to unintended discharges, meaning instances when a gun fires without user intent, at an alarmingly high rate.

55. There have been over 150 incidents (and likely multiples more) of the Sig Sauer P320 unintentionally discharging when users believed they did not pull the trigger. Many of these unintended discharges have caused severe injury to the users and/or bystanders.

56. The vast majority of these users are law enforcement officers, former military personnel, and/or highly trained and practiced gun owners.

57. At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, acting within the course and scope of their employment, service and agency.

58. This action seeks actual, compensatory, and enhanced compensatory damages, and equitable relief, relating to Defendant, Sig Sauer Inc.'s negligence, defective design, and unfair and deceptive marketing practices regarding the P320.

59. In its "Safety Without Compromise" marketing materials for the P320, Sig Sauer promises:



SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

60. Despite this express representation, which Sig Sauer has made for the last several years to the present, the weapon lacks industry-standard safety features and has fired without the user deliberately pulling the trigger many, many times.

61. Defendant, Sig Sauer, had knowledge long before the sales of the P320s used by Plaintiff that the P320 - its first ever striker-fired pistol - was capable of firing unintentionally due to defective components and/or the lack of necessary safety features, including but not limited to: a manual safety, a tabbed trigger safety, a de-cocker and/or a grip safety.

62.    For many years since the weapon was first introduced to the market in 2014, Sig Sauer has wantonly failed to recall the P320 despite knowing of scores of grievous wounds inflicted upon users and bystanders.

63.    For years before the subject incident giving rise to this action, Sig Sauer expressly represented that the weapon will not fire unless the user wants it to: "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



64.    Many U.S. law enforcement agencies, local police departments, military personnel at a commander's discretion, and private owners routinely carry pistols with a chambered round.

65.    Sig Sauer advertises that users can carry the P320 with a round chambered by annotating the P320's capacity in various configurations as "10 + 1," "12 + 1," etc.

66.    The "+ 1" represents a chambered round.

67. When Sig Sauer designed and manufactured all its pistols, including the P320, Sig Sauer knew that law enforcement personnel, military personnel and private owners routinely carry pistols with a chambered round.

68. The P320 is the first striker-fired pistol[1] Sig Sauer has ever manufactured.

69. Sig Sauer assembled the P320 using the same frame from an earlier hammer-fired Sig Sauer model, the P250.

70. While competing for a $580 million contract to supply the United States Army with a new service pistol in 2016, Sig Sauer's prototype P320s exhibited nearly 200 malfunctions during Army testing. The Army demanded that Sig Sauer fix all problems associated with the prototype.

71. The United States Army only agreed to the purchase of the P320 after Sig Sauer committed to designing an external manual safety for every military gun sold.

---

[1] A striker-fired pistol is different from the traditional "hammer-fired" pistol. It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. The P320 is designed so that the rearward movement of the slide places the striker under significant spring tension, making it ready to fire once it is released. The striker is held back by the weapon's sear. In the below illustrative photo of a typical striker-fired pistol the striker, in red, is held back by the sear, in blue. This is not a P320 as the pistol in this illustration possesses a tabbed trigger safety which the P320 distinctly and critically lacks.



72.    The P320 that injured Plaintiff was not offered by Sig Sauer with a manual safety, *or any external safety.*

73.    An external manual safety, at the time the subject gun was sold, was certainly technologically feasible for the P320.

74.    A properly functioning and active external manual safety, at the time the subject gun was sold, would preclude a properly functioning P320 from firing in an unintended fashion.

75.    Upon information and belief, every striker-fired pistol on the market except the P320 is equipped with some type of external safety: whether it be a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

76.    Upon information and belief, Sig Sauer manufactures the only striker-fired pistols on the market that are not equipped with any form of external safety.

77.    Upon information and belief, every single-action pistol on the market is equipped with some type of manual safety: whether it be a thumb safety, tab trigger safety, grip safety, or de-cocker.

78.    Upon information and belief, Sig Sauer manufactures the only single-action pistols on the market that are not equipped with any form of external safety.

79.    Since the P320's manufacture and distribution into the stream of commerce, Sig Sauer has expressly represented that the weapon possessed a "robust safety system":



80.    Indeed, Sig Sauer originally manufactured the P320 to include a tabbed trigger safety as an optional external safety for the P320.

81.    Despite SigSauer's representations, Sig Sauer never made a tabbed trigger safety available as an option for the P320.[2]

82.    In fact, Sig Sauer's original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

83.    When Sig Sauer shipped P320s to dealers for sale to civilian consumers, Sig Sauer knew or should have known; a.) that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses; and b.) that un-commanded discharges could occur in the ordinary course of using the weapon.

_____

[2] A tabbed-trigger safety is a small tab within the trigger which must be depressed in order for the entire trigger to be depressed, thus preventing incidental discharges.

84.    The injuries suffered by Plaintiffs, and harm caused to many others, were the foreseeable result of Sig Sauer's own Failure Modes and Effects Criticality Analysis ("FMECA") performed by Sig Sauer for both its internal use and analysis, and its FMECA analysis provided to the United States Military in or around 2016.

85.    Defendant was on notice of the risks of the P320's design.

86.    In 2016-17, the United State Military required that Sig Sauer conduct a Failure Modes and Effects Criticality Analysis.

87.    The purpose of the FMECA was to assess the vulnerabilities of the P320 to certain health and safety risks associated with the use of the P320.

88.    The FMECA identified the first five risks associated with the use of the P320 as being unintended discharges.

89.    One of those five risks was the ***unintended trigger actuation by a foreign object.***

90.    The risk of unintended trigger actuation was that it could kill someone.

91.    In 2016 Sig Sauer was aware of incidents in which the P320 discharged due to unintended trigger actuation—a known risk from the FMECA analysis.

92.    At no time did Sig Sauer require that each P320 include at least one external safety.

93.    Indeed, it continued to sell P320's with no external safeties to consumers, even when Sig Sauer knew of the unreasonable risks and danger associated with unintended discharges due to the P320's design.

94.    In 2015, a Pennsylvania State Trooper and firearms instructor killed another trooper with his Sig Sauer pistol when it discharged without a trigger pull during safety training.

95.    In 2016, a tactical response training instructor near Sacramento dropped his Sig Sauer, firing a bullet into a student's truck.

96.    In February 2016, a fully-holstered P320 discharged in its holster without the user touching the gun in Roscommon, Michigan, when the officer moved to exit the vehicle during a snowstorm.   The incident was captured on the Officer's body-worn camera.

97.    In 2016, the Surprise, Arizona, Police Department complained to Sig Sauer of two (2) separate incidents of P320s firing without trigger pulls.

98.    In October 2016, a P320 fired un-commanded on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

99.    In November 2016, a P320 fired un-commanded on an Officer in Holmes Beach, Florida, striking him in his leg.

100.    In 2017 in Michigan, a Sheriff's Deputy's Sig Sauer pistol discharged without a trigger pull, striking a schoolteacher in the neck.

101.    On January 5, 2017, a P320 shot a Stamford, Connecticut, SWAT team member, Vincent Sheperis, in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG SAUER's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop safe.

102.    On February 28, 2017, a P320 discharged without the user pulling the trigger by the University of Cincinnati Police Department.

103.    On June 14, 2017, a P320 discharged without the user pulling the trigger in Wilsonville, Oregon.

104.    On June 20, 2017, a P320 discharged without the user pulling the trigger while in use by the Howell Township, New Jersey Police Department.

105.    In June of 2017, Sig Sauer shipped approximately 800 P320s to the Loudoun County, Virginia, Sheriff's Department, privately assuring its leadership, Sheriff David Chapman,

that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[3]

106.    On July 28, 2017, a P320 discharged without the user pulling the trigger in Tarrant County, Texas.

107.    On August 4, 2017, the Stamford SWAT team member sued Sig Sauer in U.S. District Court in Connecticut for an un-commanded discharge of a commercial version of the P320 that shot him in his knee.

108.    Four days later, Sig Sauer's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

109.    This statement was false, in view of Sig Sauer's knowledge that Officer Sheperis in Connecticut had been shot by a drop fire some seven months earlier with the commercial version of the P320, and that several other un-commanded discharges of the P320 had occurred before that date.

110.    On August 8, 2017, Sig Sauer announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."

111.    This statement was also false, as there are no federal government standards for gun safety, a fact known to Sig Sauer when it issued this press release.

112.    No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when Congress created the Consumer Product Safety Commission in 1972.

---

[3] As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

113.    Sig Sauer's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnect switch, and an improved sear to prevent un-commanded discharges.

114.    On August 9, 2017, the Police Chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

115.    In October 2017, a P320 discharged without the user pulling the trigger in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

116.    On November 12, 2017, a P320 discharged without the user pulling the trigger in Dallas County, Texas.

117.    On February 2, 2018, a user in Oklahoma was catastrophically injured while he removed a holster containing his P320 from his belt.

118.    On February 7, 2018, Loudoun County, Virginia, Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, causing catastrophic injury and ending her career. Upon CAT scanning her P320, it was found to have both a design and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

119.    Months later in April 2018, Sig Sauer issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

120.    In May 2018, civilian Gunter Walker reported to Sig Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

121.    In June 2018, a Williams County, Ohio, Officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the Officer's arm; the other blew through his patrol car's driver's side door.

122.    In May 2018, a Rancho Cucamonga, California, Officer reported that his P320 fired un-commanded merely while he was walking inside his department locker room; the casing of the round did not eject.

123.    In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

124.    In October 2018, retired Law Enforcement Officer Stephen Mayes' P320 fired un-commanded while seated in its holster, causing severe injury to his right leg.

125.    In December 2018, civilian Robert Lang's P320 fired on him un-commanded and caused serve tunneling wounds to his right leg.

126.    On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts, SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual MayFair event near Harvard Square.

127.    The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a Sig Sauer certified armorer[4] on the P320.

---

[4] According to Sig Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty. Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.Sig Sauersaueracademy.com/course/armorer-certification

128.    On July 23, 2019, a P320 fired un-commanded on Officer Walter Collete, Jr. of the Somerville, Massachusetts, Police Department hitting him in his leg and causing substantial injuries to his leg.

129.    In August 2019, Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway concourse. The incident was captured on video, and the officer was returned to duty the next day.

130.    The transit authority replaced all Sig Sauer P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

131.    On September 3, 2019, another P320 in use by the Loudoun County Virginia's Sheriff's Office fired un-commanded on another Loudoun County Deputy Sheriff, Carl Costello, hitting his leg.

132.    On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts, Police Department, was shot by his P320 without him pulling the trigger. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

133.     On October 11, 2019, a P320 fired un-commanded on Veterans Affairs Police Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

134.     On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California, Police Department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster.

135.     On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts, Police Department, as he was in the process of putting his duty belt on.

136.     Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to un-commanded discharges causing injury in both 2016 and 2017.

137.     On January 1, 2020, Colorado resident, Brian Tennant, was injured when his fully holstered P320 discharged without him touching the trigger.

138.     On February 15, 2020, Pasco County, Florida, Sheriff's Deputy David Duff was injured when his P320 discharged without him pulling the trigger while the gun was in its holster on his duty belt.

139.     On February 27, 2020, Tampa Police Department Reserve Officer Howard Northrop was severely and permanently injured when his service-issued P320 discharged without him pulling the trigger, while inside his service-issued holster.

140.     On March 31, 2020, Michigan resident, Anthony Buck, was injured when his P320 unintentionally discharged as he holstered the pistol.

141.     On April 15, 2020, Yakima, Washington, Police Officer Nathan Henyan was injured when his P320 discharged from within its holster without him pulling the trigger.

142.     On June 19, 2020, Army veteran George Abrahams was injured when his P320 discharged without him pulling the trigger.

143.     At the time of Mr. Abrahams' incident, his P320 was contained within the holster that came in the box with his gun, which he kept in his fully zippered pants pocket.

144.     On July 14, 2020, Milwaukee Police officer Adam Maritato was injured when his partner's duty-issued P320 discharged from within its holster while the two were attempting to detain a suspect.

145.     On July 27, 2020, ICE Agent Joseph Halase was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

146.     In 2020, a Wyoming Highway Patrol officer experienced an unintentional discharge, leading the Wyoming Highway Patrol to abandon the P320 as its standard duty weapon.

147.     On September 21, 2020, a P320 fired un-commanded while in the possession of Deportation Officer Keith Slatowski of Immigration and Customs Enforcement during a training exercise in New Castle, Delaware.

148.     On November 9, 2020, Tampa Police Officer Jerry Wyche was injured when his holstered P320 discharged without him pulling the trigger as he was getting out of his police vehicle.

149.     On December 8, 2020, ICE Agent Catherine Chargualaf was injured when her P320 discharged from within its holster without her pulling the trigger during a training exercise.

150.     On January 23, 2021, civilian Timothy Davis was injured when his Sig Sauer P320 X-Carry discharged in its holster without a trigger pull.

151.    On April 1, 2021, ICE Agent Fernando Armendariz was injured when his duty-issued P320 discharged without his finger touching the trigger while he was in the process of holstering the pistol.

152.    On May 12, 2021, Department of Homeland Security Agent Amy Hendel was injured when her P320 discharged without her pulling the trigger during a training exercise.

153.    On May 17, 2021, Metro Transit Police officer, Erin Cooper, was injured when her P320 discharged while she put on her duty belt containing her holstered P320.  Officer Cooper never touched the P320's trigger and did not intend to fire the gun.

154.    On June 2, 2021, Troy, New York, Police Officer Michael Colwell suffered permanent injuries when his P320 discharged in his holster during a training exercise while his hands were not touching the gun.

155.    On June 5, 2021, Texas resident, William Campbell, was injured when his P320 unintentionally discharged as he racked the slide.

156.    On June 15, 2021, Massachusetts resident Kyla Ellis was injured when her P320 discharged without her pulling the trigger while it was in its holster.

157.    On July 31, 2021, Richmond County police officer, Timothy Rzasa, was injured when his P320 discharged without him pulling the trigger as he holstered the pistol.

158.    On August 18, 2021, Richmond County, Georgia, Sheriff's Deputy James Garth was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

159.    On October 11, 2021, Florida resident Stephen Fernandez was injured while participating in the National Park Service Seasonal Law Enforcement Academy when his P320

unintentionally discharged as he attempted to remove the pistol from its holster. Fernandez never touched the P320's trigger and did not intend to fire the gun.

160.    On November 2, 2021, Florida resident Michael Parker was injured when his P320 discharged without him pulling the trigger while he was removing the fully holstered P320 from his pocket.

161.    On November 29, 2021, Atlantic County, New Jersey, Prosecutor's Office Detective James Scoppa suffered severe tinnitus when his holstered P320 discharged without him pulling the trigger while he was inside of his car.

162.    On December 5, 2021, ICE Agent Mary Doffeny suffered severe emotional harm when her duty-issued P320 discharged from within a dedicated compartment in her purse.

163.    Ms. Doffeny' s incident was caught on video, which clearly shows the gun going off without her pulling the trigger.

164.    On January 15, 2022, Connecticut resident Zachary Brown was injured when his P320 discharged from within its holster without Mr. Brown pulling the trigger while he was attempting to remove the holster from his pants.

165.    On February 7, 2022, Honesdale, Pennsylvania, Police Officer Donald Thatcher's P320 discharged from its holster while he was exiting his car.

166.    Officer Thatcher's incident was captured on video, which clearly shows that Officer Thatcher's hands were not touching his holster at the time the P320 discharged.

167.    Following this incident, the Honesdale, Pennsylvania, Police Department pulled all P320s out of service and sued Sig Sauer for a refund of the firearms.

168.    On February 12, 2022, former Navy Small Arms Instructor Dionicio Delgado was injured when his P320 discharged from within its holster without him pulling the trigger.

169.    On February 26, 2022, Texas resident Juan Duran was injured when his P320 discharged without him pulling the trigger while it was in his holster.

170.    On March 28, 2022, Houston, Texas, Police Sergeant Marvin Reyes's P320 discharged from its holster while he was entering his car.

171.    Sergeant Reyes' incident was captured on video, which unmistakably shows that Sergeant Reyes's hands were reaching into his truck and not near his holstered P320 at the time it discharged visible below.



*Officer Marvin Reyes, Houston, TX*
*P320 discharging in its holster*

172.    On April 4, 2022, Georgia prosecutor Matthew Breedon was injured when his P320 discharged without him pulling the trigger while he was in the process of removing it from his holster.

173.    On May 25, 2022, former Georgia correctional officer and former Monticello, Georgia, police officer Dwight Jackson was injured when his holstered P320 discharged without him pulling the trigger.

174.    On September 10, 2022, a Milwaukee Police Officer's holstered P320 discharged while the officer was attempting to detain a suspect.

175.    Following this incident, the third in as many years involving a Milwaukee Police Officer, the Milwaukee Police Association filed a lawsuit against the City of Milwaukee to have the gun removed from service.

176.    In response to the incidents of Milwaukee Police Officers being injured by the P320, Milwaukee Police Chief Jeffrey Norman announced on October 31, 2022, that the Milwaukee Police Department would replace every single P320 in its arsenal with pistols manufactured by one of Sig Sauer's competitors.

177.    On October 19, 2022, New Jersey resident Nicola Bevacqua was injured when his P320 discharged when he racked the slide. Bevacqua did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

178.    On November 7, 2022, Oklahoma resident William Clegg was injured when his P320 discharged from within its holster after making contact with a small wooden paddle.

179.    On March 27, 2022, Florida resident Cordell Hamilton was injured when his P320 discharged when he holstered the pistol.  Hamilton did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

180.    On April 14, 2022, Minnesota resident Christian Wuollet was injured when his P320 discharged without him pulling the trigger as he holstered the pistol.

181.    On July 19, 2022, ICE Agent, John McArtor, was injured when his P320 unintendedly discharged when he holstered the pistol. Agent McArtor never touched the trigger or intended to fire the P320.

182.    On September 10, 2022, Milwaukee Police Department Officer Laskey-Castle was injured when his partner Officer Lee's fully holstered P320 discharged while performing a crime scene investigation. Officer Lee never touched the trigger or intended to fire the P320.

183.    On October 4, 2022, Nevada resident, Wendell Cuasito, was injured when his P320 unintentionally discharged. Cuasito did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

184.    On October 18, 2022, Puerto Rico State Police Officer, Melvin Rivera, was injured when his holstered P320 discharged without him pulling the trigger while the pistol was in his waistband.

185.    On November 10, 2022, Texas resident, Rodney Gaston, was injured when his P320 discharged while it was in his right pocket as he walked in Houston, Texas.  Gaston never touched the trigger or intended to fire the P320.

186.    On November 13, 2022, United States Army firearms instructor, Cody Higgins, was injured when his P320 discharged without him pulling the trigger when he holstered the pistol.

187.    On November 16, 2022, Puerto Rico State Police Officer, Johnny Davis, was injured when his holstered P320 discharged without him pulling the trigger when he adjusted his waistband.

188.    On November 26, 2022, Arkansas resident, Paulo Jacuzzi, was injured when his P320 unintentionally discharged as he racked the slide. Jacuzzi did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

189.    On November 29, 2022, ICE Agent, Russell Dykema, was injured when his holstered P320 discharged without him pulling the trigger as he exited his vehicle.

190.    On January 7, 2023, Montana resident, Michael Lingo, was injured when his P320 unintentionally discharged while at a gun range. Lingo did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

191.    On January 24, 2023, Virginia State Police Officer Marcos Hernandez was injured when his holstered P320 discharged as he walked into his office building.  Officer Hernandez did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

192.    On July 24, 2023, Officer Daniel Witts' P320 discharged while in its holster without him touching the gun as his arms were wrapped around a suspect's legs.  This incident was captured on security camera and body camera which show his hands nowhere near the gun at the time of discharge.



*Officer Daniel Witts, Montville, CT*
*P320 discharging in its holster*

193.    Between 2015-2022, there have been at least *nine* incidents where an Oklahoma Highway Patrol Officer had a P320 discharge when the officer did not pull the trigger.

194.    Internal documents from Immigration Customs Enforcement provide that unintended discharges skyrocketed when it switched its primary weapon from a Glock to the P320, with the P320 accounting for a nearly ***500% increase*** in unintended discharges.

195.    The unintended discharges involving the P320 have not showed any signs of abating because Sig Sauer has done nothing to address the lack of external safeties on the gun.

196.    On May 9, 2024, in La Grange, Texas, Officer Currington was shot by his holstered P320 duty pistol which pierced his leg and nearly caused him to bleed to death.  He was found, barely conscious, with his P320 secured in its retention holster and a spent shell casing in the chamber.

197.    On September 20, 2024, in Marble Falls, Texas, a school resource officer, Hunter Galley was preparing to work the homecoming football game at Mustang Stadium when his holstered P320 discharged while he was standing outside of the passenger side of his vehicle without his touching or manipulating the gun and he was shot in the leg.

198.    Sig Sauer is aware of other claims of unintended discharges involving the P320 beyond those identified above.

199.    As of the date of this Complaint, Sig Sauer has been aware of over 150 reports or claims of P320 unintended discharges.

200.    As of the date of this Complaint, Sig Sauer has been aware of claims that P320 unintended discharges have killed users.

201.    As of the date of this Complaint, Sig Sauer has been aware of more unintended discharges of Sig Sauer P320s than any other gun it makes since the time the P320 first went to market.

202.    To date, Sig Sauer has never issued a mandatory recall of the P320 and continues to sell the P320, putting profits above the health and safety of its users.

## PLAINTIFFS' INCIDENTS

### Bernard Anderson

203.    Prior to May 10, 2023, Bernard Anderson and co-worker Dave Taylor had extensive firearms experience as police officers.

204.    Prior to May 10, 2023, Officer Taylor was issued a P320 by the police department.

205.    On May 10, 2023, Officer Taylor's holstered pistol suddenly and unexpectedly discharged, causing metal from the round to strike Officer Anderson.

206.    Officer Taylor did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

207.    Officer Anderson was struck in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

208.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

209.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical

care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Andrew Bielsten**

210.    Prior to June 9, 2023, Andrew Bielsten had extensive firearms experience as a gun owner and police officer.

211.    Prior to June 9, 2023, Officer Bielsten purchased a P320 for personal use.

212.    On June 9, 2023, while unholstering his P320, Officer Bielsten's pistol suddenly and unexpectedly discharged.

213.    Officer Bielsten did not squarely place his finger on the trigger within the trigger guard and did not intend the gun to discharge.

214.    The bullet struck Officer Bielsten in his left hip, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

215.    While the full extent of the physical damage Officer Bielsten sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

216.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet

to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Joshua Brent**

217.    Prior to July 10, 2024, Joshua Brent had extensive firearms experience as a law enforcement officer and firearms instructor.

218.    Prior to July 10, 2024, Agent Brent was issued a P320 by his employer.

219.    On July 10, 2024, Agent Brent's holstered P320 suddenly and unexpectedly discharged.

220.    Agent Brent did not place his finger on the trigger within the trigger guard and did not intend the gun to discharge.

221.    The bullet struck Brent in his right knee, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

222.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

223.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer

serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plantiff, who has received substantial and ongoing treatments and medicines.

**Mark Cunard**

224.    Prior to October 10, 2024, Mark Cunard had extensive firearms experience as a police officer and firearms instructor.

225.    Prior to October 10, 2024, Detective Cunard was issued a P320 by his employer.

226.    On October 10, 2024, Detective Cunard's holstered P320 suddenly and unexpectedly discharged.

227.    Detective Cunard did not place his finger on the trigger within the trigger guard and did not intend the gun to discharge.

228.    The bullet struck Detective Cunard in his right thigh and knee, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

229.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

230.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**<u>Daniel Davis</u>**

231.    Prior to August 25, 2024, Daniel Davis had extensive firearms experience as a police officer.

232.    Prior to August 25, 2024, Sergeant Davis was issued a P320 by his employer.

233.    On August 25, 2024, Sergeant Davis's holstered P320 suddenly and unexpectedly discharged.

234.    Sergeant Davis did not squarely place his finger on the trigger within the trigger guard and did not intend the gun to discharge.

235.    The bullet struck Sergeant Davis in his right thigh and knee, causing substantial injury, bone fractures, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

236.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

237.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Randall Farrior Jr.**

238.    Prior to November 1, 2023, retired veteran, Randall Farrior Jr., had extensive firearms experience as a gun owner.

239.    Prior to November 1, 2023, Farrior purchased a P320 for personal use.

240.    On November 1, 2023, Farrior's holstered P320 suddenly and unexpectedly discharged.

241.    Farrior did not squarely place his finger on the trigger within the trigger guard and did not intend the gun to discharge.

242.     The bullet struck Farrior in his right thigh, causing substantial injury, maceration and necrosis of tissue, blood loss, and nerve damage, along with severe emotional trauma.

243.     While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

244.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Alberto Flores**

245.     Prior to July 11, 2023, US Ranger, Alberto Flores, had extensive firearms experience as a law enforcement officer.

246.     Prior to July 11, 2023, Ranger Flores was issued a P320 by his employer.

247.     On July 11, 2023, Ranger Flores's holstered P320 suddenly and unexpectedly discharged.

248.    Ranger Flores did not squarely place his finger on the trigger within the trigger guard and did not intend the gun to discharge.

249.    The bullet struck Ranger Flores in his right ankle, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

250.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

251.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Dennis Hall**

252.    Prior to January 29, 2023, firearms instructor, Dennis Hall, had extensive firearms experience as a gun owner and firearms instructor.

253.    Prior to January 29, 2023, Hall purchased a P320 for personal use.

254.    On January 29, 2023, Hall's holstered P320 suddenly and unexpectedly discharged.

255.    Hall did not squarely place his finger on the trigger within the trigger guard and did not intend the gun to discharge.

256.    The bullet struck Hall in his left calf, causing substantial injury, maceration of tissue, blood loss, infection, and nerve damage, along with severe emotional trauma.

257.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

258.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Anthony Johnson**

259.    Prior to May 13, 2023, US Army veteran, Anthony Johnson, had extensive firearms experience as a gun owner.

260.    Prior to May 13, 2023, Johnson purchased a P320 for personal use.

261.    On May 13, 2023, Johnson's holstered P320 suddenly and unexpectedly discharged.

262.    Johnson did not squarely place his finger on the trigger within the trigger guard and did not intend the gun to discharge.

263.    The bullet struck Johnson in his right thigh and exited below his knee, causing substantial injury, bone fracture, cartilage damage, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

264.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

265.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Kyle Knickerbocker**

266.    Prior to March 10, 2023, Kyle Knickerbocker, had extensive firearms experience as a protection officer.

267.    Prior to March 10, 2023, Knickerbocker was issued a P320 by his employer.

268.    On March 10, 2023, Knickerbocker's holstered pistol suddenly and unexpectedly discharged.

269.    Knickerbocker did not squarely place his finger on the trigger within the trigger guard.

270.    Knickerbocker did not intend the gun to discharge.

271.    The bullet struck Knickerbocker in his left foot, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

272.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

273.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment.

The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Yang Lee**

274.    Prior to September 10, 2022, Yang Lee had extensive firearms experience as a police officer.

275.    Prior to September 10, 2022, Officer Lee was issued a P320 by his employer.

276.    On September 10, 2022, Officer Lee's holstered P320 suddenly and unexpectedly discharged.

277.    Officer Lee did not squarely place his finger on the trigger within the trigger guard.

278.    Officer Lee did not intend the gun to discharge.

279.    The bullet struck Officer Lee's partner Charles Laskey-Castle who was located behind Officer Lee in his left leg.

280.    Injuring Officer Laskey-Castle caused Officer Lee severe emotional trauma. Plaintiff developed depression and struggled with symptoms of traumatic stress.

281.    While the full extent of the damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished capacity.

282.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer psychological and emotional anguish.  Plaintiff has in the

past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Kelly McDaniel**

283.    Prior to May 19, 2024, Kelly McDaniel had extensive firearms experience as a gun owner, firearms instructor, and competitive shooter.

284.    Prior to May 19, 2024, McDaniel purchased a P320 for personal use.

285.    On May 19, 2024, McDaniel's holstered P320 suddenly and unexpectedly discharged.

286.    McDaniel did not squarely place his finger on the trigger within the trigger guard.

287.    McDaniel did not intend the gun to discharge.

288.    The bullet struck McDaniel in his right calf, causing substantial injury, bone fracture, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

289.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

290.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in

the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Thomas McMillan**

291.    Prior to May 4, 2023, Thomas McMillan had extensive firearms experience as a police officer and firearms instructor.

292.    Prior to May 4, 2023, Lieutenant McMillan purchased a P320 for personal use.

293.    On May 4, 2023, Lieutenant McMillan's holstered P32o suddenly and unexpectedly discharged.

294.    Lieutenant McMillan did not squarely place his finger on the trigger within the trigger guard.

295.    Lieutenant McMillan did not intend the gun to discharge.

296.    The bullet struck Lieutenant McMillan in his right knee and foot, causing substantial injury, bone fracture, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

297.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

298.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet

to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Joel Navarro**

299.    Prior to August 21, 2023, Joel Navarro had extensive firearms experience as an investigator.

300.    Prior to August 21, 2023, Navarro was issued a P320 by his employer.

301.    On August 21, 2023, Navarro's holstered P320 suddenly and unexpectedly discharged.

302.    Navarro did not squarely place his finger on the trigger within the trigger guard.

303.    Navarro did not intend the gun to discharge.

304.    The bullet struck Navarro in his left foot, causing substantial injury, tissue contusion, swelling, and nerve damage, along with severe emotional trauma.

305.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

306.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer

serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Vincent Panico**

307.    Prior to April 24, 2023, Vincent Panico had extensive firearms experience as a police officer.

308.    Prior to April 24, 2023, Officer Panico was issued a P320 by his employer.

309.    On April 24, 2023, Officer Panico's holstered P320 suddenly and unexpectedly discharged.

310.    Officer Panico did not squarely place his finger on the trigger within the trigger guard.

311.    Officer Panico did not intend the gun to discharge.

312.    The bullet struck Officer Panico in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

313.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

314.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Andrew Parisio**

315.    Prior to August 11, 2023, Andrew Parisio had extensive firearms experience as a gun owner.

316.    Prior to August 11, 2023, Parisio purchased a P320 for personal use.

317.    On August 11, 2023, Parisio's holstered pistol suddenly and unexpectedly discharged.

318.    Parisio did not squarely place his finger on the trigger within the trigger guard.

319.    Parisio did not intend the gun to discharge.

320.    The bullet struck Parisio in his right thigh and calf, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

321.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

322.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Elona Presson**

323.    Prior to September 23, 2022, Elona Presson had extensive firearms experience as a police officer.

324.    Prior to September 23, 2022, Officer Presson was issued a P320 by her employer.

325.    On September 23, 2022, Officer Presson's holstered P320 suddenly and unexpectedly discharged.

326.    Officer Presson did not squarely place her finger on the trigger within the trigger guard.

327.    Officer Presson did not intend the gun to discharge.

328.    The bullet struck Officer Presson in her right calf, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

329.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that she will never be able to return to her pre-incident form as a result of diminished physical capacity.

330.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Gregory Rochelle**

331.    Prior to May 30, 2023, Gregory Rochelle had extensive firearms experience as a gun owner.

332.    Prior to May 30, 2023, Rochelle purchased a P320 for personal use.

333.    On May 30, 2023, Rochelle's holstered P320 suddenly and unexpectedly discharged.

334.    Rochelle did not squarely place his finger on the trigger within the trigger guard.

335.    Rochelle did not intend the gun to discharge.

336.    The bullet struck Rochelle in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

337.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

338.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Bryan Scott-Williams**

339.    Prior to April 1, 2023, Bryan Scott-Williams had extensive firearms experience as a gun owner.

340.    Prior to April 1, 2023, Scott-Williams purchased a P320 for personal use.

341.    On April 1, 2023, Scott-Williams's holstered P320 suddenly and unexpectedly discharged.

342.    Scott-Williams did not squarely place his finger on the trigger within the trigger guard.

343.    Scott-Williams did not intend the gun to discharge.

344.    The bullet struck Scott-Williams in his right thigh, causing substantial injury, chipped bone, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

345.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

346.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Robert Sheffield**

347.    Prior to October 10, 2024, Robert Sheffield had extensive firearms experience as a law enforcement officer.

348.   Prior to October 10, 2024, Agent Sheffield was issued a P320 by his employer.

349.   On October 10, 2024, Agent Sheffield's holstered P320 suddenly and unexpectedly discharged.

350.   Agent Sheffield did not squarely place his finger on the trigger within the trigger guard.

351.   Agent Sheffield did not intend the gun to discharge.

352.   The bullet struck Agent Sheffield in his left thigh, causing substantial injury, bone damage, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

353.   While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

354.   As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Gary Sovereign**

355.    Prior to April 30, 2023, Gary Sovereign had extensive firearms experience as a gun owner.

356.    Prior to April 30, 2023, Sovereign purchased a P320 for personal use.

357.    On April 30, 2023, Sovereign's holstered P320 suddenly and unexpectedly discharged.

358.    Sovereign did not squarely place his finger on the trigger within the trigger guard.

359.    Sovereign did not intend the gun to discharge.

360.    The bullet struck Sovereign in his right foot, causing substantial injury, bone damage, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

361.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

362.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment.

The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

**Gustavo Tudon Jr.**

363.    Prior to October 2, 2024, Gustavo Tudon, Jr. had extensive firearms experience as a police officer.

364.    Prior to October 2, 2024, Officer Tudon was issued a P320 by his employer.

365.    On October 2, 2024, Officer Tudon's holstered P320 suddenly and unexpectedly discharged.

366.    Officer Tudon did not squarely place his finger on the trigger within the trigger guard.

367.    Officer Tudon did not intend the gun to discharge.

368.    The bullet struck Officer Tudon in his right calf, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

369.    While the full extent of the physical damage Plaintiff sustained is not yet known, it is likely that he will never be able to return to his pre-incident form as a result of diminished physical capacity.

370.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and

emotional anguish. Plaintiff has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Plaintiff's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Plaintiff, who has received substantial and ongoing treatments and medicines.

## COUNT I – NEGLIGENCE
## BERNARD ANDERSON V. SIG SAUER

371.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

372.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

373.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

374.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

375.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By misrepresenting the dangers and hazards posed by the gun;

ix.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.      By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

        xii.    Other negligent acts and omissions to be developed in the course of discovery.

376.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

377.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

378.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

379.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT II - STRICT PRODUCT LIABILITY
### BERNARD ANDERSON V. SIG SAUER

380.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

381.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the <u>Restatement (Second) of Torts</u> because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

382.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

383.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

384.    The defective condition of the P320 caused Plaintiff's injuries.

385.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

386.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT III – NEGLIGENCE
## ANDREW BIELSTEN V. SIG SAUER

387.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

388.     At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

389.     At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

390.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

391.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

392.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

393.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

394.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

395.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT IV - STRICT PRODUCT LIABILITY
### ANDREW BIELSTEN V. SIG SAUER

396.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

397.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

        a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

398.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

399.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

400.    The defective condition of the P320 caused Plaintiff's injuries.

401.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

402.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## <u>COUNT V - NEGLIGENCE</u>
### JOSHUA BRENT V. SIG SAUER

403.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

404.   At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

405.   At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

406.   At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

407.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

      ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

      iii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

      iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By misrepresenting the dangers and hazards posed by the gun;

ix.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.      By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

408.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

409.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

410.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

411.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT VI - STRICT PRODUCT LIABILITY
### JOSHUA BRENT V. SIG SAUER

412.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

413.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

414. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

415. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

416. The defective condition of the P320 caused Plaintiff's injuries.

417. Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

418. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

### COUNT VII – NEGLIGENCE
### MARK CUNARD V. SIG SAUER

419. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

420. At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

421. At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to

prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

422.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

423.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

   i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

   ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

   iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

   iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

   v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

   vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.  By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.   Other negligent acts and omissions to be developed in the course of discovery.

424.   Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

425.   The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

426.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

427.   As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for

his care and treatment.  These injuries are either permanent or continuing in their nature, and

Plaintiff will suffer such losses and impairments in the future.

WHEREFORE, Plaintiff demands judgment in his favor and against Sig Sauer for

compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims and damages available by law.

## COUNT VIII - STRICT PRODUCT LIABILITY
### MARK CUNARD V. SIG SAUER

428.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth

herein.

429.    Sig Sauer, by and through its agents, servants, workers, contractors, designers,

assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of

the Restatement (Second) of Torts because:

 a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

 b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

 c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

 d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above

430.    The P320 was in a defective condition, as a reasonable person would conclude that

the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of

taking precautions.

431.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

432.    The defective condition of the P320 caused Plaintiff's injuries.

433.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

434.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT IX – NEGLIGENCE
### DANIEL DAVIS V. SIG SAUER

435.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

436.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

437.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

438.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or

70

had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

439.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

440.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

441.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

442.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

443.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT X - STRICT PRODUCT LIABILITY
### DANIEL DAVIS V. SIG SAUER

444. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

445. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

446. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

447. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

448. The defective condition of the P320 caused Plaintiff's injuries.

449. Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

73

450.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XI – NEGLIGENCE
## RANDALL FARRIOR JR. V. SIG SAUER

451.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

452.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

453.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

454.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

455.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By misrepresenting the dangers and hazards posed by the gun;

ix.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.      By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.     Other negligent acts and omissions to be developed in the course of discovery.

456.     Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

457.     The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

458.     Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

459.     As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

<u>**COUNT XII - STRICT PRODUCT LIABILITY**</u>
**RANDALL FARRIOR JR. V. SIG SAUER**

460.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

461.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

462.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

463.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

464.    The defective condition of the P320 caused Plaintiff's injuries.

465.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

466.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XIII – NEGLIGENCE
## ALBERTO FLORES V. SIG SAUER

467.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

468.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

469.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

470.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

471.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

472.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

473.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

474.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

475.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XIV - STRICT PRODUCT LIABILITY
### ALBERTO FLORES V. SIG SAUER

476.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

477.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

478. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

479. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

480. The defective condition of the P320 caused Plaintiff's injuries.

481. Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

482. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XV – NEGLIGENCE
## DENNIS HALL V. SIG SAUER

483. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

484.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

485.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

486.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

487.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

82

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By misrepresenting the dangers and hazards posed by the gun;

ix.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.      By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

488.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

489.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

490.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

491.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

### COUNT XVI - STRICT PRODUCT LIABILITY
### DENNIS HALL V. SIG SAUER

492.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

493.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

494.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

495.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

496.    The defective condition of the P320 caused Plaintiff's injuries.

497.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

498.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

### <u>COUNT XVII – NEGLIGENCE</u>
### ANTHONY JOHNSON V. SIG SAUER

499.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

500.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

501.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to

prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

502.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

503.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

      ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

      iii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

      iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

      v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

      vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.  By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.   Other negligent acts and omissions to be developed in the course of discovery.

504.   Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

505.   The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

506.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

507.   As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for

his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XVIII - STRICT PRODUCT LIABILITY
### ANTHONY JOHNSON V. SIG SAUER

508.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

509.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

  a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

  b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

  c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

  d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

510.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

511.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

512.    The defective condition of the P320 caused Plaintiff's injuries.

513.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

514.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

**COUNT XIX – NEGLIGENCE**
**KYLE KNICKERBOCKER V. SIG SAUER**

515.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

516.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

517.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

518.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or

had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

519.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

     i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

     ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

     iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

     iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

     v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

     vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

     vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

     viii.    By misrepresenting the dangers and hazards posed by the gun;

    ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

    x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

    xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

    xii.    Other negligent acts and omissions to be developed in the course of discovery.

520.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

521.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

522.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

523.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XX - STRICT PRODUCT LIABILITY
## KYLE KNICKERBOCKER V. SIG SAUER

524.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

525.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

526.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

527.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

528.    The defective condition of the P320 caused Plaintiff's injuries.

529.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

530.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXI – NEGLIGENCE
### YANG LEE V. SIG SAUER

531.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

532.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

533.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

534.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

535.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By misrepresenting the dangers and hazards posed by the gun;

ix.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.      By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

536.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

537.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

538.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

539.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXII - STRICT PRODUCT LIABILITY
### YANG LEE V. SIG SAUER

540.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

541.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

542.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

543.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

544.    The defective condition of the P320 caused Plaintiff's injuries.

545.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

546.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXIII – NEGLIGENCE
## KELLY MCDANIEL V. SIG SAUER

547.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

548.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

549.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

550.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

551.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

      ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

552.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

553.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

554.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

555.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

### COUNT XXIV - STRICT PRODUCT LIABILITY
### KELLY MCDANIEL V. SIG SAUER

556.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

557.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

      a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

558.  The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

559.  Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

560.  The defective condition of the P320 caused Plaintiff's injuries.

561.  Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

562.  Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXV – NEGLIGENCE
## THOMAS MCMILLAN V. SIG SAUER

563.  Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

564.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

565.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

566.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

567.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

> i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;
>
> ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;
>
> iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;
>
> iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.  By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.   Other negligent acts and omissions to be developed in the course of discovery.

568.   Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

569.   The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

570.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

571.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXVI - STRICT PRODUCT LIABILITY
### THOMAS MCMILLAN V. SIG SAUER

572.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

573.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

574.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

575.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

576.    The defective condition of the P320 caused Plaintiff's injuries.

577.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

578.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXVII – NEGLIGENCE
## JOEL NAVARRO V. SIG SAUER

579.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

580.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

581.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to

prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

582.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

583.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

     i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

     ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

     iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

     iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

     v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

     vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.  By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.   Other negligent acts and omissions to be developed in the course of discovery.

584.   Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

585.   The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

586.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

587.   As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for

his care and treatment. These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

**COUNT XXVIII- STRICT PRODUCT LIABILITY**
**JOEL NAVARRO V. SIG SAUER**

588.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

589.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

590.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

591.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

592.    The defective condition of the P320 caused Plaintiff's injuries.

593.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

594.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXIX – NEGLIGENCE
### VINCENT PANICO V. SIG SAUER

595.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

596.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

597.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

598.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or

had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

599. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i. By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii. By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv. By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi. By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii. By misrepresenting the dangers and hazards posed by the gun;

ix.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.      By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

600.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

601.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

602.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

603.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXX - STRICT PRODUCT LIABILITY
### VINCENT PANICO V. SIG SAUER

604.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

605.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

606.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

607.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

608.    The defective condition of the P320 caused Plaintiff's injuries.

609.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

610.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

**COUNT XXXI – NEGLIGENCE**
**ANDREW PARISIO V. SIG SAUER**

611.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

612.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

613.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

614.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

615.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.  By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

616.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

617.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

618.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

619.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXXII - STRICT PRODUCT LIABILITY
### ANDREW PARISIO V. SIG SAUER

620.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

621.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

622.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

623.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

624.    The defective condition of the P320 caused Plaintiff's injuries.

625.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

626.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXXIII – NEGLIGENCE
**ELONA PRESSON V. SIG SAUER**

627.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

628.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

629.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

630.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

631.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

632.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

633.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

634.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

635.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for her care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

### COUNT XXXIV - STRICT PRODUCT LIABILITY
### ELONA PRESSON V. SIG SAUER

636.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

637.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

638.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

639.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

640.    The defective condition of the P320 caused Plaintiff's injuries.

641.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

642.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXXV – NEGLIGENCE
## GREGORY ROCHELLE V. SIG SAUER

643.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

644.   At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

645.   At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

646.   At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

647.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

> i.   By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;
>
> ii.  By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;
>
> iii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;
>
> iv.  By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii. By misrepresenting the dangers and hazards posed by the gun;

ix.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.  Other negligent acts and omissions to be developed in the course of discovery.

648.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

649.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

650.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

651.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXXVI - STRICT PRODUCT LIABILITY
### GREGORY ROCHELLE V. SIG SAUER

652.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

653.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

654. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

655. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

656. The defective condition of the P320 caused Plaintiff's injuries.

657. Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

658. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXXVII – NEGLIGENCE
## BRYAN SCOTT-WILLIAMS V. SIG SAUER

659. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

660. At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

661. At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to

prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

662.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

663.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.    By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By including a defective and improper holster in the original packaging with the gun;

xii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiii.    Other negligent acts and omissions to be developed in the course of discovery.

664.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

665.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

666.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

667.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the

enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXXVIII - STRICT PRODUCT LIABILITY
### BRYAN SCOTT-WILLIAMS V. SIG SAUER

668.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

669.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

670.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

671.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

672.    The defective condition of the P320 caused Plaintiff's injuries.

673.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

674.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XXXIX – NEGLIGENCE
### ROBERT SHEFFIELD V. SIG SAUER

675.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

676.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

677.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

678.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

679.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.   By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.   Other negligent acts and omissions to be developed in the course of discovery.

680.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

681.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

682.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

683.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XL - STRICT PRODUCT LIABILITY
### ROBERT SHEFFIELD V. SIG SAUER

684. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

685. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

686. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

687. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

688.    The defective condition of the P320 caused Plaintiff's injuries.

689.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

690.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XLI – NEGLIGENCE
## GARY SOVEREIGN V. SIG SAUER

691.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

692.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

693.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

694.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

695.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

      ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

      iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

      iv.   By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

      v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

      vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

      vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

      viii.  By misrepresenting the dangers and hazards posed by the gun;

      ix.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

      x.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

696.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

697.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

698.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

699.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XLII- STRICT PRODUCT LIABILITY
## GARY SOVEREIGN V. SIG SAUER

700.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth

herein.

701.    Sig Sauer, by and through its agents, servants, workers, contractors, designers,

assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of

the Restatement (Second) of Torts because:

   a.  Sig Sauer is engaged in the regular business of designing, assembling,
       manufacturing, selling, supplying, distributing, and/or placing into the
       stream of commerce firearms, including the P320 that injured Plaintiff;

   b.  The product involved in the subject incident was marketed and/or placed in
       the general stream of commerce by Sig Sauer;

   c.  The product was expected to and did reach users without substantial change
       in the condition in which it was designed, assembled, manufactured, sold,
       supplied, distributed and/or placed into the stream of commerce;

   d.  The product was designed, assembled, manufactured, sold, supplied,
       distributed, and/or placed into the stream of commerce in the defective
       condition for the reasons set forth above.

702.    The P320 was in a defective condition, as a reasonable person would conclude that

the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of

taking precautions.

703.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or

employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in

the performance of its obligations.

704.    The defective condition of the P320 caused Plaintiff's injuries.

705.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge

caused Plaintiff's injuries.

134

706.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

**COUNT XLIII – NEGLIGENCE**
**GUSTAVO TUDON JR. V. SIG SAUER**

707.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

708.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull, before selling the gun and placing it into the stream of commerce.

709.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull, before selling the gun and placing it into the stream of commerce.

710.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

711.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, and the public, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

viii.  By misrepresenting the dangers and hazards posed by the gun;

ix.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

x.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xi.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.    Other negligent acts and omissions to be developed in the course of discovery.

712.    Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

713.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

714.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

715.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XLIV - STRICT PRODUCT LIABILITY
### GUSTAVO TUDON JR. V. SIG SAUER

716.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

717.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

  a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

  b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

  c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

  d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

718.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

719.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

720.    The defective condition of the P320 caused Plaintiff's injuries.

721.    Defendant's failure to warn of the P320's susceptibility to uncommanded discharge caused Plaintiff's injuries.

722.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims and damages available by law.

## COUNT XLV – LOSS OF CONSORTIUM
### ASHTON TRAWINSKI V. SIG SAUER

723.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

724.    At all relevant times hereto, Plaintiff, Ashton Trawinski, was the lawfully wedded wife of husband-plaintiff, Andrew Bielsten, with whom she lives.

725.    As a result of the injuries sustained by Officer Bielsten, wife-plaintiff Mrs. Trawinski has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVI – LOSS OF CONSORTIUM
### JUSTINE BRENT V. SIG SAUER

726.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

727.    At all relevant times hereto, Plaintiff, Justine Brent, was the lawfully wedded wife of husband-plaintiff, Joshua Brent, with whom she lives.

728.    As a result of the injuries sustained by Agent Brent, wife-plaintiff Mrs. Brent has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVII – LOSS OF CONSORTIUM
### LESLEY GEORGE-DAVIS V. SIG SAUER

729. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

730. At all relevant times hereto, Plaintiff, Lesley George-Davis, was the lawfully wedded wife of husband-plaintiff, Daniel Davis, with whom she lives.

731. As a result of the injuries sustained by Sergeant Davis, wife-plaintiff Mrs. George-Davis has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVIII – LOSS OF CONSORTIUM
### ALICE FARRIOR V. SIG SAUER

732. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

733. At all relevant times hereto, Plaintiff, Alice Farrior, was the lawfully wedded wife of husband-plaintiff, Randall Farrior Jr., with whom she lives.

734. As a result of the injuries sustained by Mr. Farrior, wife-plaintiff Mrs. Farrior has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLIX – LOSS OF CONSORTIUM
### MARIA FLORES V. SIG SAUER

735.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

736.    At all relevant times hereto, Plaintiff, Maria Flores, was the lawfully wedded wife of husband-plaintiff, Alberto Flores, with whom she lives.

737.    As a result of the injuries sustained by Ranger Flores, wife-plaintiff Mrs. Flores has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT L – LOSS OF CONSORTIUM
### NANCY JOHNSON V. SIG SAUER

738.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

739.    At all relevant times hereto, Plaintiff, Nancy Johnson, was the lawfully wedded wife of husband-plaintiff, Anthony Johnson, with whom she lives.

740.    As a result of the injuries sustained by Mr. Johnson, wife-plaintiff Mrs. Johnson has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LI – LOSS OF CONSORTIUM
### KATHY ALEMAN V. SIG SAUER

741.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

742.    At all relevant times hereto, Plaintiff, Kathy Aleman, was the lawfully wedded wife of husband-plaintiff, Kelly McDaniel, with whom she lives.

743.    As a result of the injuries sustained by Mr. McDaniel, wife-plaintiff Mrs. Aleman has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LII – LOSS OF CONSORTIUM
### SUSAN MCMILLAN V. SIG SAUER

744.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

745.    At all relevant times hereto, Plaintiff, Susan McMillan, was the lawfully wedded wife of husband-plaintiff, Thomas McMillan, with whom she lives.

746.    As a result of the injuries sustained by Lieutenant McMillan, wife-plaintiff Mrs. McMillan has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LIII – LOSS OF CONSORTIUM
### MARY NAVARRO V. SIG SAUER

747.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

748.    At all relevant times hereto, Plaintiff, Mary Navarro, was the lawfully wedded wife of husband-plaintiff, Joel Navarro, with whom she lives.

749.    As a result of the injuries sustained by Mr. Navarro, wife-plaintiff Mrs. Navarro has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LIV – LOSS OF CONSORTIUM
### LANA PANICO V. SIG SAUER

750.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

751.    At all relevant times hereto, Plaintiff, Lana Panico, was the lawfully wedded wife of husband-plaintiff, Vincent Panico, with whom she lives.

752.    As a result of the injuries sustained by Officer Panico, wife-plaintiff Mrs. Panico has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LV – LOSS OF CONSORTIUM
### BILLEE JO PARISIO V. SIG SAUER

753.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

754.    At all relevant times hereto, Plaintiff, Billee Jo Parisio, was the lawfully wedded wife of husband-plaintiff, Andrew Parisio, with whom she lives.

755.    As a result of the injuries sustained by Mr. Parisio, wife-plaintiff Mrs. Parisio has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVI – LOSS OF CONSORTIUM
### JAMES MANZO V. SIG SAUER

756.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

757.    At all relevant times hereto, Plaintiff, James Manzo, was the lawfully wedded husband of wife-plaintiff, Elona Presson, with whom he lives.

758.    As a result of the injuries sustained by Officer Presson, husband-plaintiff Mr. Manzo has been and will continue to be deprived of the love, assistance, companionship, consortium and society of his wife, all to his great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in his favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVII – LOSS OF CONSORTIUM
### CAROL ROCHELLE V. SIG SAUER

759.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

760.    At all relevant times hereto, Plaintiff, Carol Rochelle, was the lawfully wedded wife of husband-plaintiff, Gregory Rochelle, with whom she lives.

761.    As a result of the injuries sustained by Mr. Rochelle, wife-plaintiff Mrs. Rochelle has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVIII – LOSS OF CONSORTIUM
### KERRIE DONHAM V. SIG SAUER

762.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

763.    At all relevant times hereto, Plaintiff, Kerrie Donham, was the lawfully wedded wife of husband-plaintiff, Bryan Scott-Williams, with whom she lives.

764.    As a result of the injuries sustained by Mr. Scott-Williams, wife-plaintiff Mrs. Donham has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LIX – LOSS OF CONSORTIUM
## MICHELLE SHEFFIELD V. SIG SAUER

765.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

766.    At all relevant times hereto, Plaintiff, Michelle Sheffield, was the lawfully wedded wife of husband-plaintiff, Robert Sheffield, with whom she lives.

767.    As a result of the injuries sustained by Agent Sheffield, wife-plaintiff Mrs. Sheffield has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LX – LOSS OF CONSORTIUM
## DANIELLE SOVEREIGN V. SIG SAUER

768.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

769.    At all relevant times hereto, Plaintiff, Danielle Sovereign, was the lawfully wedded wife of husband-plaintiff, Gary Sovereign, with whom she lived.

770.    As a result of the injuries sustained by Mr. Sovereign, wife-plaintiff Mrs. Sovereign has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## <u>COUNT LXI – LOSS OF CONSORTIUM</u>
### REGINA ACUÑA V. SIG SAUER

771.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

772.    At all relevant times hereto, Plaintiff, Regina Acuña, was the lawfully wedded wife of husband-plaintiff, Gustavo Tudon Jr., with whom she lives.

773.    As a result of the injuries sustained by Officer Tudon, wife-plaintiff Mrs. Acuña has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Respectfully submitted,

**DOUGLAS, LEONARD & GARVEY, P.C.**

Date:  March 27, 2025            By:    */s/ Benjamin T King*
                                        BENJAMIN T. KING, NH Bar #12888
                                        14 South Street, Suite 5
                                        Concord, NH 03301
                                        (603) 224-1988
                                        benjamin@nhlawoffice.com

                                 AND

**SALTZ MONGELUZZI & BENDESKY P.C.**

Date:  March 27, 2025            By:    */s/ Robert W. Zimmerman*
                                        LARRY BENDESKY, PA Bar # 51026
                                        ROBERT W. ZIMMERMAN, PA Bar #208410
                                        RYAN D. HURD, PA Bar #205955
                                        SAMUEL A. HAAZ, PA Bar #314507
                                        *Pro Hac Vice Applications to be filed*
                                        One Liberty Place, 52nd Floor
                                        1650 Market Street

Philadelphia, PA 19103
(215) 496-8282
lbendesky@smbb.com
rzimmerman@smbb.com
rhurd@smbb.com
shaa@smbb.com